IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

                                    :

ARCHIE PORTER, Individually
and as Personal Representative      :
of the Estate of Charles Barnes
                                    :

    v.                              : Civil Action No. DKC 2006-1964

                                    :

PRINCE GEORGE'S COUNTY,
 MARYLAND, ET AL.                   :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this civil rights case is a motion for summary judgment by Defendants Prince George's County and Detective Brian Padgett. (Paper 30). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion for summary judgment will be granted.

## I.  Background

The following statement of facts is presented in the light most favorable to Plaintiff, the nonmoving party, with disputes of fact where noted. On the evening of April 23, 2005, Charles Barnes ("Decedent"), Marcus Rembert, and Maurice Watson were socializing outside the home of Mr. Rembert's cousin. An argument developed among the three men. During this time, Detective Brian Padgett drove through the area in his patrol car and noticed what he thought were three men yelling and using profanity in an apparent altercation in front of an apartment building. Detective Padgett

drove around the block to see whether the altercation would end on its own.  As Detective Padgett returned around the block, Decedent fired a handgun three times, without hitting anyone.  Although Plaintiff's witnesses contend that Detective Padgett was not in a position to see the shots, he testified that he saw the muzzle flashes.  Detective Padgett hurriedly emerged from his unmarked patrol car wearing his police uniform and badge.  There is some dispute as to the sequence of events that transpired, but the parties agree that there was an automobile between Decedent and Detective Padgett, that Decedent bent down behind the automobile, and that when Decedent started to stand up from behind the automobile, Detective Padgett shot him, wounding him fatally.

Mr. Watson's account of the event is that Detective Padgett emerged from his patrol car, pointed his weapon at Decedent, shouted at Decedent to drop his weapon, and then immediately fired two shots over Decedent's head.  Mr. Watson recalls that Decedent then ducked behind the parked car, dropped his weapon out of view from Detective Padgett, raised his open empty hands above his head and began to stand up, at which time Detective Padgett shot him.

Detective Padgett contests these facts.  He indicates that he exited his patrol car and told Decedent to drop his gun, but did not shoot at that time.  He then states that Decedent ducked out of sight behind the parked car.  Detective Padgett testified that he warned Decedent numerous times to drop the gun and to get down on

the ground.  Detective Padgett stated that Decedent began to run, fell when he ran into one of the other men, started to get up, and pointed the gun at the officer.  Detective Padgett continued to yell commands, to drop the gun and lie on the ground.  At some point, he also yelled for him to put his hands up.  He did not see Decedent drop his weapon, saw his head emerge from behind the car but did not see his hands, and fired his weapon.  The officer said that he thought Decedent was going to shoot him and was taking cover.

The initial complaint was filed in the United States District Court for the District of Columbia.  (Paper 1).  After amendment, the case was transferred to this court pursuant to a July 14, 2006 Order by Judge John D. Bates.  (Paper 8).  The amended complaint asserts claims for violations of Decedent's civil rights under 42 U.S.C. § 1983, for violation of Decedent's rights under the Maryland Declaration of Rights, and for negligence, assault and battery, and wrongful death under Maryland law against Detective Padgett; Prince George's County, Maryland; Prince George's County Executive, Jack Johnson; and the Prince George's County Chief of Police, Melvin C. High.  Detective Padgett and Chief High were both named in their individual and official capacities.  The claims against Jack Johnson and Chief High have been dismissed.  (Paper 19).  Count I of the amended complaint now alleges federal civil rights violations against both Defendants.  Count II alleges

violations of Decedent's rights under the Maryland Declaration of Rights against both Defendants.   Count III claims that both Defendants caused the wrongful death of Decedent.   Count V alleges negligence against both Defendants.[1]   Count VI alleges assault and battery against both Defendants.   Count VII alleges that Prince George's County negligently hired and trained Detective Padgett. Count VIII alleges the tort of intentional infliction of emotional distress against both Defendants.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).   The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba*

---

[1]  The complaint does not include a Count IV.

4

*Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. Admissibility of Expert Opinion Testimony

Plaintiff relies, in part, on the "expert opinion" deposition testimony of Joseph J. Stine.  (Paper 33, Ex. 4, Stine Dep.).  Defendants contend that the testimony is inadmissible because it is opinion testimony to legal conclusions.  (Paper 34, at 1-4).  The portion of Mr. Stine's deposition presented by Plaintiff consists of Mr. Stine's personal conclusions that Defendant Padgett's conduct violated Decedent's civil rights and constituted negligence, assault, and battery.  (Paper 33, Ex. 4, Stine Dep. at 145, 148, 151, 155).  The only rationale presented was that the officer did not give Decedent an opportunity to comply with the verbal commands (*Id*. at 146).

Federal Rule of Evidence 702 provides that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert may testify thereto.  Thus, under this rule, as applied by *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), Mr. Stine's testimony should be admitted only if it meets two criteria: (1) it will be helpful to the trier of fact, and (2) it concerns "scientific, technical, or other specialized knowledge."

Although the Fourth Circuit has no blanket rule regarding the admissibility of expert testimony in excessive force cases, *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993), and ultimate issue

6

testimony alone does not mandate exclusion, *id.* at 379, expert testimony that provides little information besides how the verdict should read is generally unhelpful and may be excluded. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). At issue in this case is the reasonableness of Detective Padgett's actions. Mr. Stine's testimony, however, does not address customary police practice, but rather simply asserts legal conclusions that Detective Padgett's actions violated Decedent's rights. The proffered testimony of Mr. Stine did not offer specialized knowledge regarding police use of firearms, but rather only offered legal conclusions, given particular interpretations of the contested facts, as to the reasonableness of Detective Padgett's use of force at issue in this case. Instead of assisting the jury, such expert opinion risks "supplant[ing] a jury's independent exercise of common sense" and its role of determining the facts. *Id*. at 377. "It is the responsibility--and the duty--of the court to state . . . the meaning and applicability of the appropriate law," *Adalman v. Baker, Watts, & Co.*, 807 F.2d 359, 366 (4th Cir. 1986), *aff'd in part, rev'd in part,* 807 F.2d 359 (4th Cir. 1986). Evidence supplied by experts as to legal conclusions is not admissible, "nor indeed 'evidence' at all." *Safeway, Inc. v. Sugarloaf Partnership, LLC.*, 423 F.Supp.2d 531, 539 (D.Md. 2006) (quoting *Nutrition 21 v. United States*, 930 F.2d 867, 871 n. 2 (Fed. Cir. 1991)). As Professor Wigmore observed, expert testimony

on law is excluded because "the tribunal does not need the witness'
judgment. . . . [T]he judge [or the jury as instructed by the
judge] can determine equally well. . . ." The special legal
knowledge of the judge makes the witness' testimony superfluous.
VII Wigmore on Evidence § 1952, at 81. Thus, because Mr. Stine's
testimony is neither helpful to the factfinder, nor within his
specialized knowledge, the court will exclude it for purposes of
deciding Defendants' motion for summary judgment.

**IV. § 1983 Claims**

**A. Detective Padgett in his Individual Capacity**

The amended complaint asserts that Detective Padgett used
excessive and unreasonable force against Decedent in violation of
Decedent's rights under the Fourth, Fifth, and Fourteenth
Amendments. A court must begin its analysis of a § 1983 claims of
excessive force "'by identifying the specific constitutional right
allegedly infringed by the challenged application of force.'" *Carr
v. Deeds*, 453 F.3d 593, 600 (4th Cir. 2006) (*quoting Graham v.
Connor*, 490 U.S. 386, 394 (1989). A claim, as here, asserting that
a decedent was killed through constitutionally unreasonable force,
invokes the decedent's "Fourth Amendment right to be free of
arrests, investigatory stops, or other seizures effectuated by
excessive force." *Id.* (*citing Graham*, 490 U.S. at 388). Although
the complaint also cites to the Fifth and Fourteenth Amendments,
any Constitutional violation alleging excessive force by Detective

8

Padgett in shooting Decedent is properly analyzed under the Fourth Amendment.  *See Graham*, 490 U.S. at 395 ("*all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").

Defendants assert that this right was not violated, or in the alternative, that any violation is subject to qualified immunity. Qualified immunity:

> protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Thus, government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*Short v. Smoot*, 436 F.3d 422, 426-27 (4th Cir. 2006).  In considering qualified immunity:

> The threshold question that a court must first answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right.  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified

immunity." However, "if a violation could be
made out on a favorable view of the parties'
submissions, the next, sequential step is to
ask whether the right was clearly
established;" that is, "whether it would be
clear to a reasonable officer that his conduct
was unlawful in the situation he confronted."

*Mazuz v. Maryland*, 442 F.3d 217, 225 (4th Cir. 2006) (quoting

*Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)) (internal citations

omitted).

A right is clearly established "when 'its contours [are]

sufficiently clear that a reasonable official would understand that

what he is doing violates that right.'" *Ridpath v. Bd. of

Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting

*Hope v. Pelzer*, 536 U.S. 730 (2002)). The exact action in question

need not have been held to be unlawful "because 'general statements

of the law are not inherently incapable of giving fair and clear

warning, and . . . a general constitutional rule already identified

in the decision law may apply with obvious clarity to the specific

conduct in question.'" *Ridpath*, 447 F.3d at 313 (quoting *Anderson

v. Creighton*, 483 U.S. 635 (1987)); *Owens ex rel. Owens v. Lott*,

372 F.3d 267, 279 (4th Cir. 2004). The court therefore must

consider "not only already specifically adjudicated rights, but

those manifestly included within more general applications of the

core constitutional principle invoked." *Owens*, 372 F.3d at 279

(quoting *Amaechi v. West*, 237 F.3d 356, 362-63 (4th Cir. 2001)).

The key issue is whether the law, at time that the relevant events

occurred, "gave the officials 'fair warning' that their conduct was
unconstitutional."  *Ridpath*, 447 F.3d at 313.

The first issue raised by the qualified immunity analysis is
whether the facts, viewed in the light most favorable to the
plaintiff, establish a violation of the right to be free of arrest
effectuated by excessive force.   The Fourth Circuit has detailed
the balancing test applicable to such a claim:

> A claim that a police officer used such
> excessive force during an arrest is analyzed
> under an "objective reasonableness" standard.
> An officer's actions are not excessive if they
> "are 'objectively reasonable' in light of the
> facts and circumstances confronting [him],
> without regard to [his] underlying intent or
> motivation."  *Id.* at 397, 109 S.Ct. 1865.
> Determining the reasonableness of the
> challenged actions "requires a careful
> balancing of the nature and quality of the
> intrusion on the individual's Fourth Amendment
> interests against the countervailing
> governmental interests at stake."  *Id.* at 396,
> 109 S.Ct. 1865 (internal quotation marks
> omitted).  Proper application of the test of
> reasonableness also "requires careful
> attention to the facts and circumstances of
> each particular case, including the severity
> of the crime at issue, whether the suspect
> poses an immediate threat to the safety of the
> officers or others, and whether he is actively
> resisting arrest or attempting to evade arrest
> by flight."  *Id.*  "Because 'police officers
> are often forced to make split-second
> judgments-in circumstances that are tense,
> uncertain, and rapidly evolving,' the facts
> must be evaluated from the perspective of a
> reasonable officer on the scene, and the use
> of hindsight must be avoided."  *Waterman v.
> Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005)
> (quoting *Graham*, 490 U.S. at 397, 109 S.Ct.
> 1865) (internal citation omitted).

> "[T]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). However, such deadly force may be employed "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11, 105 S.Ct. 1694. "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12, 105 S.Ct. 1694.

*Carr*, 453 F.3d at 600.

In applying this balancing test, the Fourth Circuit has held that an officer need not "wait until a gun is pointed at [him] before [he] is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131, (4th Cir. 2001). Furthermore, because the facts are viewed objectively from the perspective of a reasonable officer at the scene, neither testimony by witnesses that may in some respects contradict the officer's account nor proof that the decedent was not actually armed necessarily raise a material question of fact sufficient to overcome summary judgment. *Id.* at 130-131, 132. Indeed, "[i]n a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer." *Russell*, 247 F.3d at 130.

12

Observations of others at the scene of a police shooting may well differ from those of the officers and the record must be carefully examined to determine whether the different perceptions reflect a material dispute of fact:

> While the officers attempt to use *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), as authority for the proposition that only the officers' perception of Rogers' intoxication matters legally, and thus his testimony cannot, as a matter of law, create an issue of material fact, they misread *Sigman*. *Sigman* does not stand for the proposition that the objective facts of an encounter are always legally irrelevant whenever an officer asserts that his perception of an encounter was such as to justify his action. Instead, the *Sigman* court addressed a situation in which officers had uncontroverted evidence of a suspect's dangerousness and knew that the suspect was armed and was behaving violently within a residence. *Sigman* held that the statements of persons who claimed to have observed, from a cheering mob on the other side of the street, that the suspect was unarmed did not create a triable issue of material fact where the officers closest to the encounter unanimously testified that they perceived the suspect to be armed. *Id.* at 787. The *Sigman* Court concluded that given the volatile and dangerous atmosphere and the need to make a split-second self-defense decision, the question of whether the suspect had a knife was not necessarily material to the question of whether a reasonable officer could have perceived him to be a violent threat.[7] *Id.* at 788 (stating, "we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of the shooting is material to the question of whether Officer Riddle is entitled to" qualified immunity).

---

[7] Further, *Sigman* is based in part on the proposition that officers need not in all

> cases actually perceive a suspect to be armed
> before firing. *See Sigman v. Town of Chapel
> Hill*, 161 F.3d 782, 788 (4th Cir.1998).

*Rogers v. Pendleton*, 249 F.3d 279, 292-93 (4th Cir. 2001).  This

case is like *Sigman* in that Decedent was undeniably armed with a

handgun and had discharged the weapon just a short time before.

Padgett was aware that Decedent fired three shots from the gun.

Padgett responded to the shots fired by drawing his weapon and

ordering Decedent to drop the gun and to get on the ground.  Mr.

Watson testified in his deposition that at the time Detective

Padgett fatally shot him, Decedent had his hands open and raised

above his head.  However, even when considered in the light most

favorable to Plaintiff, Mr. Watson's testimony does not undermine

the reasonableness of Detective Padgett's actions based upon the

totality of the circumstances as he perceived them at the time.

Padgett's deposition testimony established that he did not see

Decedent's hands, but only saw Decedent's head rising above the car

and that Padgett feared that Decedent still held the gun and posed

a threat to him.  That Mr. Watson says he was able to see

Decedent's hands from his position does not mean that they were not

obstructed from Detective Padgett's view from his position by the

parked car.  Moreover, at no time did Decedent inform Padgett that

he had dropped the gun and nothing in evidence establishes that

Padgett saw Decedent raise his empty hands above his head in

surrender.  Detective Padgett knew that at some point Decedent had

14

a gun from which he had fired multiple shots and he knew that the Decedent did not respond verbally to his demands and did not lie down on the ground as instructed.   In light of the Decedent's actions as perceived by Detective Padgett at the time, Padgett reasonably perceived that Decedent posed a substantial threat to his safety.   Thus, even if Mr. Watson's testimony is taken as true, it does not undermine the objective reasonableness of Padgett's actions under the circumstances as known to him at the time.   Thus because Detective Padgett knew that Decedent was angry and had fired shots and because it was reasonable for him to believe that Decedent continued to pose a serious threat of harm, Padgett had probable cause for a deadly force seizure.

**B.   Prince George's County and Detective Padgett in his Official Capacity.**

A claim against a public official in his or her official capacity is simply one way of asserting a claim against the governmental unit of which the official is a part:

> Suits against local government officials in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent . . . ." *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611, 635 n. 55 (1978). Consequently, "the real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301, 309 (1991). *See also Ritchie v. Donnelly, supra,* 324 Md. [344] at 358-359, 597 A.2d [432] at 439 [(1991)].

*Ashton v. Brown*, 339 Md. 70, 111 (1995).  Stated otherwise:

> While "[p]ersonal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and in essence are "suit[s] against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)(internal quotation marks omitted).

*Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000).  Accordingly, the claims against Detective Padgett in his official capacity are the same as the claims against Prince George's County.

A municipality can be liable under § 1983 only if the constitutional violation was caused by official policy or custom, such as:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir. 2003)(quoting *Carter v. Morris*, 164 F.3d 215, 217(4th Cir. 1999)).  Section 1983 supervisory liability requires an underlying constitutional violation by the supervisor's subordinate.  *See Young v. City of Mt. Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) (citing *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A

16

claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised.")).   The Fourth Circuit has set forth three elements necessary to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).   Plaintiff presents no evidence whatsoever to suggest that Prince George's County should be liable in this case.   Thus even if Detective Padgett violated Decedent's Fourth Amendment rights, summary judgment would be granted to Defendant Prince George's County.

**V. Claims under the Maryland Constitution**

Plaintiff alleged in the complaint that Detective Padgett violated Decedent's right to be free from unreasonable searches and seizures under Articles 24 and 26 of the Maryland Declaration of Rights.   Plaintiff based these claims on the same factual allegations he used to support his § 1983 Fourth Amendment search and seizure claims.   In their motion for summary judgment,

Defendants adopted and incorporated the arguments made with regard to the federal Fourth Amendment claims.

Article 24 protects substantive due process rights and Article 26 protects against unreasonable searches and seizures; the statutes are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution, respectively. *See, e.g.*, *Canaj, Inc. v. Baker and Div. Phase III*, 391 Md. 374, 424 (2006).

As in federal law, Maryland follows the principle of statutory construction that "a specific statutory provision governs over a general one." *See Lumbermen's Mut. Cas. Co. v. Insurance Com'r.*, 302 Md. 248, 268 (1982). Where one statutory provision specifically addresses a matter, and another more general statutory provision also may cover the same matter, "the specific statutory provision is held to be applicable and the general provision is deemed inapplicable." *Id.* The Supreme Court held that because the Fourth Amendment provides an explicit textual source of constitutional protection against unreasonable searches and seizures, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide" for analyzing conduct that could potentially fall under either category. *Graham*, 490 U.S. at 395. The court, therefore, will consider Plaintiff's alleged injury solely under the more specific text of Article 26:

> That all warrants, without oath or
> affirmation, to search suspected places, or to

> seize any person or property, are grievous and
> oppressive; and all general warrants to search
> suspected places, or to apprehend suspected
> persons, without naming or describing the
> place, or the person in special, are illegal,
> and ought not to be granted.

MD CONST. art. XXVI.   Maryland courts "accord great respect and deference to the decisions of the United States Supreme Court in interpreting the [Fourth] [A]mendment" when construing Article 26. *Carter*, 367 Md. at 458; *see also Muse v. State*, 146 Md.App. 395, 402 n.7 (2002) ("Constructions of the federal amendment by the United States Supreme Court are controlling authority").   The Maryland Declaration of Rights differs from § 1983 in one important respect, public officials have no immunity from civil liability for violations of an individual's state constitutional rights. *Ashton*, 339 Md. at 101.

The same facts that supported Plaintiff's § 1983 unreasonable search and seizure claims under the Fourth Amendment apply with equal force to Plaintiff's corresponding state claims under Article 26. *See Solis v. Prince George's County*, 153 F.Supp.2d 793, 803 (D.Md. 2001).   Accordingly, Detective Padgett is again entitled to summary judgment because Plaintiff has not shown as a matter of law that Detective Padgett's actions exceeded the bounds of the Fourth Amendment, and by extension the bounds of Article 26.

Similarly, Prince George's County is entitled to summary judgment because there was no underlying constitutional violation. Further, because a claim against a public official in his or her

official capacity is simply one way of asserting a claim against the governmental unit of which the official is a part and because Plaintiff has not suggested any rationale for maintaining both methods of bringing claims against Prince George's County, summary judgment as to Count II will be granted to Defendants.

## VI. State Law Tort Claims

## A. Tort Claims against Prince George's County

Defendants assert that Prince George's County is entitled to summary judgment with respect to Plaintiff's common law tort claims because, as a municipality, it is immune from suit based on the tortious acts of its employees.

A state's right to governmental immunity is "deeply ingrained in Maryland law" and may not be waived in the absence of express or implied statutory authorization. *Nam v. Montgomery County*, 127 Md.App. 172, 182 (1999); *see also Khawaja v. Mayor and City Council, City of Rockville*, 89 Md.App. 314, 325 (1991) (explaining that Local Government Tort Claims Act ("LGTCA") Md.Code Ann., Cts. & Jud.Proc. § 5-401 *et seq.*, which in certain instances, imposes liability on local governments, does not operate as a waiver of governmental immunity).  A municipality, such as the County, is also entitled to governmental immunity. *Nam*, 127 Md.App. at 183. ("When the state gives a city or county part of its police power to exercise, the city or county to that extent is the state."). Specifically, municipalities are generally immune from common law

tort suits when engaged in governmental, as opposed to proprietary, acts. *Id.; see also Ashton*, 339 Md. at 101 (1995) (citing *Clea v. City of Baltimore*, 312 Md. 662, 667 (1988)). "The operation of a police force is a governmental function." *Hector v. Weglein*, 558 F.Supp. 194, 206 (D.Md. 1982) (citations omitted). Thus, the County is immune as to common law tort claims asserted against it based on torts committed by its police officers. *See Williams v. Prince George's County*, 112 Md.App. 526, 532, 554 (1996) (holding that the County was shielded by governmental immunity when tort claims were asserted against it in its individual capacity for torts allegedly committed by County officers); *see also Lanford v. Prince George's County*, 199 F.Supp.2d 297, 302 (D.Md. 2002) (applying governmental immunity to negligent hiring and training claim). Prince George's County is not liable for any intentional torts committed by Detective Padgett because such torts would have been committed while he was acting in a governmental capacity, and a local government entity such as Prince George's County is immune from liability for tortious conduct committed while acting in a governmental capacity.

The Fourth Circuit, applying Maryland law, concluded that a "[c]ounty enjoys governmental immunity with respect to the claims that seek to impose *respondeat superior* liability for an intentional tort committed by [a police officer]." *Gray-Hopkins v. Prince George's County, Md.,* 309 F.3d 224, 234 (4th Cir. 2002).

Under Maryland law, a county "is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity." *Id.* (citing *DiPino*, 354 Md. at 47-48).

In *DiPino*, a municipal police officer was sued for multiple intentional torts. The plaintiff also sought to impose *respondeat superior* liability on the municipality for those torts. The Maryland Court of Appeals held that the municipality was entitled to governmental immunity because the officer was alleged to be performing a governmental function. 354 Md. at 47-48; *see also Town of Port Deposit v. Petetit*, 113 Md.App. 401, 420 (1997) (holding that the Town was entitled to governmental tort immunity for torts committed by the Chief of Police arising out of governmental activity).

Assuming that Detective Padgett was acting within the scope of his employment so as to render *respondeat superior* applicable, he was performing a governmental function. *DiPino,* 354 Md. at 47-48 (holding that law enforcement is a governmental function). Therefore, Prince George's County is entitled to governmental immunity from liability for any intentional torts committed by Detective Padgett. Summary judgment is proper to Plaintiff's state tort claims against the County.

**B. Tort Claims against Detective Padgett**[2]

**i. Negligence Claim**

Under Maryland law, "[o]nce it is established that the individual is a public official and the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability." *DiPino* 354 Md. 18,49 (1999); *see* Md.Code Ann., Cts. & Jud.Proc. § 5-522; Md.Code Ann., State Gov't § 12-104(a).

> Under Maryland law, the malice necessary to defeat immunity under § 5-522 is what is often referred to as "actual malice" – that is, conduct "motivated by ill will, by an improper motive, or by an affirmative intent to injure." *Shoemaker v. Smith*, 353 Md. 143 (1999). A similarly high threshold must be crossed to establish gross negligence – the defendant must have "acted with wanton or reckless disregard for the safety of others." *Boyer v. State*, 323 Md. 558, 594 A.2d 121, 132 (1991); *cf. State v. Albrecht*, 336 Md. 475, 649 A.2d 336, 348 (1994) (defining gross negligence as conduct "so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences." (citation and internal quotation marks omitted)).

---

[2] As Defendants noted in their motion for summary judgment, it would nonsensical to consider a claim that Detective Padgett negligently hired and trained himself. Accordingly, the court construes Count VII as against Defendant Prince George's County only.

*Young*, 238 F.3d at 578-79.  It is undisputed that Detective Padgett was on duty in his capacity as a Prince George's County police officer at the time of the incident.  Detective Padgett's actions were discretionary acts.  Plaintiff alleges malice, but fails to offer evidence of malice on Detective Padgett's part.  As discussed above, Detective Padgett had probable cause to shoot Decedent because of his objectively reasonable fear for his own life.  Therefore, Detective Padgett is entitled to public official immunity under Maryland law and the negligence and wrongful death counts cannot stand.

## ii. Intentional Infliction of Emotional Distress

To prove a claim of intentional infliction of emotional distress, Plaintiff must show: (1) Defendants' conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (2) a causal connection existed between the conduct and the emotional distress; and (4) the emotional distress was severe (the "severity" prong).  *Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F.Supp.2d 658, 666 n. 20 (D.Md. 2007); *see also  Caldor v. Bowden*, 330 Md. 632, 641-42 (1993) (citing *Harris v. Jones*, 281 Md. 560, 566, (1977)).  Each element of the tort must be established by adequate proof.  *Caldor*, 330 Md. at 642.  To satisfy the severity prong, a plaintiff must show "he suffered a severely disabling emotional response to the defendant's conduct."  *Harris*, 281 Md. at 570; *see also Rich v. United States of America*, 158

F.Supp.2d 619, 630 (D.Md.2001) (plaintiffs' claim failed as they provided only an unsubstantiated allegation that they suffered "severe emotional distress, indignity, trauma, and pain and anguish"); *Caldor*, 330 Md. at 643-45 (finding that Plaintiff failed to establish the severity prong after showing one visit to a psychologist, and offering his own testimony regarding weight loss and feeling upset, embarrassed, confused and "bad about himself" as a result of the defendant's conduct).

Defendants contend summary judgment is appropriate as to Plaintiff's intentional infliction of emotional distress claim because Plaintiff failed to show that Detective Padgett's actions were extreme and outrageous.  In order to constitute "extreme and outrageous" conduct, a defendant's actions must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hines*, 157 Md.App. at 558.  In light of the evidence that Detective Padgett's conduct was reasonable under the circumstances, Plaintiff has failed to establish an essential element of the tort, and his claim fails.

### iii. Assault and Battery

A battery is "an offensive, non-consensual touching -- the 'unlawful application of force to the person of another.'" *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 131 (2001) (internal citations omitted).  A battery may occur through a

defendant's indirect contact with the plaintiff. *Nelson v. Carroll*, 355 Md. 593, 600-601 (1999) (holding that defendant committed a battery when he struck plaintiff on the side of his head with his handgun). "Likewise, an indirect contact, such as occurs when a bullet strikes a victim, may constitute a battery." *Id.* at 601. Under Maryland law, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Id.* at 600. "The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Id.* at 602.

A "law enforcement officer is not liable for assault and battery or other tortious conduct performed during the course of his official duties unless he acted with actual malice toward the plaintiff, *i.e.* with ill will, improper motivation or evil purpose." *Goehring v. United States*, 870 F.Supp. 106, 108 (D.Md. 1994) (internal quotations omitted). "[A]ssault and battery can only occur when there is no legal authority or justification for the arresting officer's actions." *Hines v. French*, 157 Md.App. 536, 551 (2004).

Plaintiff has not put forth any evidence to establish that Detective Padgett acted with actual malice. However, gross negligence may also defeat immunity. *See Lynn v. O'Leary*, 264

F.Supp.2d 306, 311 (D.Md. 2003) (denying government official immunity for state law claims of assault and battery, negligent failure to train/supervise, intentional infliction of emotional distress, and conversion because amended complaint sufficiently alleged gross negligence). The court explained above that Detective Padgett's actions were not wanton and unnecessary, but rather objectively reasonable under the circumstances as he perceived them at the time. Accordingly, Detective Padgett had legal justification for his actions and Plaintiff's claim against him for assault and battery must fail.

## VII. Wrongful Death

The amended complaint contains a separate count for wrongful death.

> Under the current statute, in order for a beneficiary to maintain an action for wrongful death, there must have been a "wrongful act," defined by Md. Code (1974, 2002 Repl. Vol.), § 3-901(e) of the Courts & Judicial Proceedings Article, as "an act, neglect, or default including a felonious act *which would have entitled the party injured to maintain an action and recover damages if death had not ensued.*" (Emphasis added.)

> We interpret the definition as meaning that the decedent must have been able to maintain a compensable action as of the time of death. In other words, in order for an act to be wrongful, the decedent must have had a compensable action as of death.

*Benjamin v. Union Carbide Corp.*, 162 Md.App. 173, 188-189, 873 A.2d 463, 472 (Md.App. 2005). Because all of the survival claims

brought by the estate in the amended complaint fail, so does the claim for wrongful death.

## VIII. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted.  A separate Order will follow.

```
                    /s/
        _____
        DEBORAH K. CHASANOW
        United States District Judge
```